The case will be taken under advisement. The court will now turn to the second case on today's call, which is number 171314, Kemp v. Liebel. Mr. Falk, we'll let the courtroom settle down for a minute. Thank you. I think we have things well under control, Mr. Falk. You can proceed. Thank you. May it please the court, in 2014 Larry Kemp and Brian Woodring were confined to the Pendleton Correctional Facility in Indiana. They are both Jewish, and at that facility they were able to receive a kosher diet and were able to meet at least weekly with other Jewish prisoners for prayer and study. However, in 2014 they were notified by David Liebel, the Director of Religious Services for the Department of Correction, that if they wanted to continue their kosher diet they would have to accept a move to another facility where there would be a new kosher kitchen open. They accepted the move because they wanted to continue their life as observant Jews. What they were not told, of course, is that the facility to which they were being transferred, Wabash Valley Correctional Facility, did not have any opportunity for congregate worship or meetings for Jews because the facility did not have a volunteer to supervise, had not been able to find a volunteer, and had been looking for some time. Mr. Kemp and Mr. Woodring did not know this, but of course Mr. Liebel did, and he had control over the transfer. He could have delayed it until such time as services and study were available, but he did not, and there was no need to transfer the two prisoners at this time because even after they were transferred, some prisoners continued to receive kosher diets at the old facility. Were those prisoners who were retained in the first facility there for any particular reason? Were there disciplinary problems or medical problems, something that kept them there? That's exactly right. I think they were retained somewhere in segregation, somewhere in a mental health unit. One I'm not sure of. One was not transferred to December. The point is that the department and Mr. Liebel knew that if there were reasons to keep the prisoners in place, they could be kept in place. He did not keep them in place. So in April of 2014, Mr. Kemp and Mr. Woodring were faced with the incongruous situation of being transferred to a new facility solely because of their religious needs, only to find out when they got there that the most basic need, the ability to meet with fellow co-religionists, was simply not available. And it was not until January of 2015 that traditional Jewish services began at the facility. The transfer of the prisoners violated their First Amendment rights. Mr. Liebel is not entitled to qualified immunity, and the district court should be reversed. Mr. Liebel violated their rights because he failed to stop or delay the transfer that was made solely to serve religious needs, even though he knew religious needs could not be met, and even though he knew that there was no immediacy to the transfer. Under Turner, of course, the First Amendment rights of prisoners can be overcome if the actions of the correctional officials are reasonably related to legitimate theological reasons. This standard is not met here. Mr. Liebel argues, going through the four prongs of Turner, that the transfer in April of 2014 had a rational connection to the desire to aggregate all the prisoners in one or few institutions for kosher diets to save money. However, the cost saving for these two prisoners was either minimal or nonexistent. Kosher meals continued to be served to some prisoners in the original institution, thereby indicating that if there was a reason to keep prisoners, they certainly could be kept there without destroying any goal of the DOC. And most importantly, the ultimate goal here was not just to save money. It was to save money while honoring the religious needs. If that's the goal, it makes absolutely no sense to transfer them to a prison where Mr. Liebel knew those needs could not be met. There were no alternative means to exercise the right to congregate worship and study once they got to the new facility. Allowing them to remain in the old facility would have had no impact whatsoever on guards or other prisoners and would have had a minimal impact at best on resources. We're talking two prisoners, and the meals were either not very much more expensive, $3 more expensive, or the evidence that we brought in after, and I apologize, it was brought in after in our footnote too, is that the reality was it did not cost the DOC anything, but at best, a minimal cost. And finally, there was already an obvious alternative to the move, which was to keep them in place until services and study were available. And the fact that this ready alternative was there demonstrates that the move in April was an exaggerated response. Mr. Liebel did not prevent the transfer, even though he knew the religious lives here would be profoundly injured. Given all the circumstances, the decision to allow them to be moved was irrational and arbitrary and therefore violated free exercise. Mr. Falk, is the great harm here there's no religious leader? That was why they could not have services in congregate worship and study. The department sought to find a leader, but is your point the absence of a religious leader is what caused Mr. Liebel to suffer in his First Amendment rights? I mean, the harm here is that because there was no religious leader in the new institution, at that point, DOC policy was you could not meet. In fact, in December of 2004, the record shows the policy changed. So now prisoners are allowed to meet without an on-site volunteer. But at that point, without that volunteer, and Mr. Liebel was aware there would be none, there was none. Without that volunteer, Mr. Liebel knew that those two prisoners were not going to be able to meet at all with other Jews. Between April and January? Between April and January. January is when the first traditional Jewish service began. There was a service in December of 2014, which turned out to be led by a Messianic Jewish minister, which was not a traditional Jewish service. Which is not what? A traditional Jewish service. I appreciate that. But even that was eight months. But what is the, they were trying to make an effort. Maybe he just didn't get enough advance notice about Wabash Valley. Apparently that's kind of remote, I guess. I don't know. And to get Jewish services, it's better if it's closer to a higher populated area. I think that's... I think that's probably accurate. And so I guess he made a mistake with thinking that this shouldn't be that hard to do, to get somebody to Wabash Valley, but apparently it was. Well, I think... I don't think he knew darn well he wasn't going to be able to get anybody, but he's going to transfer them anyway. Well, I think the evidence demonstrates that he knew that Wabash Valley, which had a preexisting Jewish population, a few prisoners, had not been able to find a volunteer despite looking for quite some time, is what the wording of his deposition was. And that at the time of the move, that was still not available. He could have kept those two prisoners at minimal burden where they were in Pendleton, but he chose to allow them to move where they did not know, of course. But when they arrived, they found out they could not have congregate worship or study. Why did they pick Wabash Valley for one of four, I guess, what do you call them, kosher kitchens? I am not sure, and I don't know if the record reflects that. I think part of it might be the actual physical plant and the availability to add the kosher kitchen is actually a separate kitchen within an existing kitchen that is sealed off, gated off, so maybe there wasn't room. I do not know. I do know the evidence shows, I believe, there were many more Jews at Pendleton than there were at Wabash Valley, but be that as it may, we're not criticizing a move. Prisoners, of course, generally cannot criticize their move, but they can, however, criticize a move that is in violation of their free exercise rights, which is exactly what this was. And Mr. Liebel or someone in his position, even though this fact pattern you cannot find in reported cases, Mr. Liebel should have known, reasonably should have known, that the rights here were being violated. And the right here that is being violated, that is clearly established, is the right of a prisoner not to have their sincere religious exercise seriously burdened, absent a legitimate penological interest. This is precisely how the right is defined for qualified immunity purposes by this court in Conyers, in Grayson, in Williams, by numerous other appellate courts that we have cited. And this is the precise right that Mr. Liebel violated. He is not entitled to qualified immunity because no reasonable person in his position who is in charge of religious programming for the Department of Correction, in charge of the religious lives of these prisoners, would have thought that you can take these two prisoners, take them away from one facility solely so their religious lives can continue, but place them someplace that Mr. Liebel knew their religious lives would be profoundly injured. What's the remedy? Well, at this point, the remedy is damages. Is it punitive? We have asked for punitive damages because we think that this is a situation where the law is clear and where his actions are reckless at best. I understand how difficult it is from litigation, from running a prison. I understand Mr. Liebel has a difficult job. He and I have had many interactions. He's a very pleasant man with a difficult job. But here, of course, he made a profound mistake, and he could have easily avoided a clear First Amendment violation merely by letting these two prisoners stay until he was sure their religious lives could be maintained. He failed to do that, and he is therefore liable for damages. You said there, I think you said there was a, I don't want to say significant or substantial, but there were a number of other Jewish people at Pendleton that weren't moved. I believe there were. There were a number, and I don't. And they stayed there for external reasons besides their being Jewish. I think the record shows there were two prisoners who were in, I believe, segregation. There was one prisoner in a mental health unit, and there was another prisoner, a fourth prisoner, who was moved in December. There were some prisoners who were not receiving a kosher diet or who gave up their kosher diet, who stayed and therefore gave up their kosher diet and were allowed to continue their congregate services. Mr. Kemp and Mr. Woodering were not, obviously didn't know they were being forced to give up their congregate services. They wanted to pursue Jewish law to the extent possible. Therefore, they wanted to go somewhere where they could continue their kosher diet and have services and study. The latter was not possible because of Mr. Liebel's actions. Well, were they, I don't want to call them volunteers, but were they just okay with moving, thinking they were going to get that? Yes, and they were volunteers. Mr. Liebel sent a letter to them, a notice to them, saying either you agree to stay, but you have to give up the kosher diet, which was the prepackaged type TV dinner for lunch and dinner, or we're going to move you to this new kosher kitchen. And they said, well, we'll move because we want to continue our lives as Jews, and that was what was taken from them. They got their diet, of course, but they did lose the profoundly important ability to have congregate prayer. Mr. Falk, have you found any case where the transfer to a facility that provides the right of the group to worship when there's an outside clergy unavailable to lead or train inmates? This case actually would really break new ground, right? I can't find any case. I don't think you cited any. Yes, as I admit readily, for qualified immunity purposes, there is no case that is factually the same, but that's not the end of the qualified immunity analysis, obviously. The qualified immunity analysis says even if there are cases not factually on all fours, would a reasonable person in their position know the right was firmly established? He wouldn't know it from a prior case. He would certainly know that he does not have the right to arbitrarily deny a person's religious liberty absent a legitimate penological interest, and that is the standard for qualified immunity that this court and many other courts have set up. So we have to assume he knew that there would be no potential for a volunteer at Pendleton? He knew that at the time that they moved that there was not a volunteer. He knew that they had been trying for some time. He knew that they had not been able to obtain one. That's all in the record of what he knew, and we also know that if he had said, look, let's keep these two prisoners there at Pendleton until that volunteer is there, or he could have gone to the person in charge of transfer and said, could you transfer them to, there were four kosher kitchens open, at least one of the other institutions, maybe others already had services in place, they possibly could have been transferred there. He did nothing except let them go to a place where he knew their religious needs could not be met. What's the record on the commitment by the plaintiff to these religious services? Does the record reflect whether they were weekly involved? Yes, the record reflects that both plaintiffs attended at least weekly. I think Mr. Woodring indicated sometimes he would have a visit so he would not go, but their attendance was basically always there, and they always had not just services but study as well. Thank you. Mr. Craft. Good morning, Your Honor. Thank you. May it please the Court. David Liebel is entitled to qualified immunity for three reasons. First, existing case law affirmatively signaled to Mr. Liebel that there was no constitutional impediment to transferring Jewish prisoners to Wabash Valley Correctional Facility. Second, the plaintiffs defined clearly established law at way too high a level of generality, contrary to the Supreme Court's jurisprudence on the matter. And third, implementation of the kosher kitchen program, which involved moving nearly all Jewish offenders receiving kosher meals to a facility with a kosher kitchen, satisfied the Turner Ohlone standard. Now, for 30 years, this Court has held that prohibiting group worship at a facility due to the absence of a qualified outside volunteer does not violate the free exercise rights of offenders. This is the Hadid v. Horn case and the Johnson Bay v. Lane case, along with several non-precedential decisions over the last few years. The reasons are because you don't want to place offenders in perceived positions of authority. You also don't want offenders who may not be knowledgeable on religious doctrine and dogma fighting it out over disagreements. You also don't want offenders using group worship as a facade for fomenting conspiracy or gang meetings. The Department of Correction has had such a policy, and this is why at Wabash Valley services weren't available. Now, the plaintiffs want to say they're not complaining about the lack of services at Wabash Valley, but as the district court pointed out, that really is what they're complaining about. Even if you look at it from the perspective of the transfer, though, a reasonable official in Mr. Liebel's position would be faced with another line of authority, and that's the Supreme Court's decision starting in Meacham v. Fano, which holds that there's no liberty interest and generally no right to remain at a particular prison. Now, there are two exceptions to that that have been acknowledged. One, if you are being transferred from your facility to a supermax prison, this is the Wilkinson decision, then you have a liberty interest. Two, the circuits have held, including this circuit, that you cannot be transferred to a higher security facility in retaliation for constitutionally protected conduct. And most of the time, this occurs when a prisoner has been transferred because he submits grievances or complains about misconduct of guards. The plaintiffs cite a case from the Eighth Circuit, and this is the closest they ever get to finding something remotely on point, where an offender who was a member of a church run by the Aryan Brotherhood was transferred, and he alleged at the very early stage that he was transferred because he believed in this Aryanism religion. In that case, the Eighth Circuit held that he had stated a retaliation claim because he had been moved to be punished for his exercise of religion. But that is not what has occurred in this case. The plaintiffs were not punished. The moves were not to punish the prisoners. The moves were part of this overall plan to reduce the cost of providing kosher meals and to streamline production. Was this something that was going to be applied, I don't know how many prisons there are, but they chose four of them to have the kosher kitchen? Yes. At the time of this incident, there were four. There are now five facilities with kosher kitchens. How many prisons? I don't know if that matters, but there are quite a few. There are quite a few. I believe ballpark there are about 15 medium and maximum security facilities with a bunch of lower security facilities peppered throughout the state. Now, the criteria for selecting the facilities are listed in the record at docket 48-1, page 17. And as Mr. Falk pointed out, a large part of this was physical plant. You had to have the space to have another kitchen. They also wanted strong Aramark staff, so Aramark's the food provider. And there are special procedures to follow to ensure that the kitchen remains kosher, and so that was looked at. The department also wanted to make sure that there were varying security levels so that you would have some place for Level 1, Level 2, Level 3, Level 4 on up. What is Wabash Valley? I'm sorry? What level is Wabash Valley? It's maximum security. It's Level 4, along with the state prison. Now, Pendleton is also Level 4 maximum security, but Pendleton, my understanding, Pendleton was not chosen because Pendleton, although it's not as old as the state prison, is a very old facility and just does not have the space to add another kitchen. I think that the big point, and we highlight this in our brief, the plaintiff's position creates quite an anomaly. Under the plaintiff's view, the Jewish offenders who were at Wabash Valley prior to the transfer, who were wanting services but couldn't get them because there were no outside volunteer available, have no free exercise claim because Hadid v. Horn and Johnson Bay v. Lane say that that does not violate the First Amendment. Had Kemp and Woodring remained at Pendleton and for some reason the Lubavitch rabbis were unable to visit there and the qualified offenders, let's say, got released onto parole and there was no one to lead services and services had to stop while they were at Pendleton, they would not have a First Amendment claim again under Hadid v. Horn. It's only because they were transferred from Pendleton at a time when services were ongoing at Pendleton to Wabash Valley, where services weren't going on at that time, despite the repeated efforts of legal to get services out there. It's only because of the transfer that they would be entitled to any relief or that there's a constitutional violation in the first place. But a reasonable official in view of this court's line of cases in Hadid v. Horn, starting with Hadid, and the Supreme Court's line starting with Meacham, a reasonable official could not predict such an anomalous result. Now, the plaintiffs urged the court to basically ignore all of that, ignore what the legal terrain was that faced Mr. Liebel and require Mr. Liebel and officials every time something comes up to apply Turner alone on new facts, despite what prior case law has said. Turner, though, cannot create clearly established law under the Supreme Court's precedent. I concede that Mr. Falk has cited in his brief a number of decisions from around the country from various circuit courts suggesting that it can. But reading cases like Ziegler v. Abbasi, White v. Pauley, Mulenix v. Luna, Ashcroft v. Al-Kid, just the cases from the last seven years from the Supreme Court established that you have to show that the violative nature of the particular conduct was clearly established. And here, that just cannot be. Turner is a multifactored post hoc reasonableness test, and such a standard just cannot create clearly established law. The plaintiffs have identified no controlling case holding that a transfer from a facility with religious services to a facility without those particular services so that the offender can maintain a religious diet violates the free exercise clause. I also think this brings into issue a third line of cases from this court, and that includes the cases like Thompson v. Holm, which really talk about the importance of religious diet. So this court has repeatedly said that if an inmate wants a religious diet for religious reasons, you better have a really good reason not to give it to them. And in most of those cases, DOC officials have been found liable. So here we've got a situation where Mr. Liebel, knowing that it's important to maintain a diet for offenders, but also knowing that the department wants to centralize food production and reduce costs, he has to figure out what to do. Do I take away the meals, or do I move them to a facility that has a kosher kitchen so they can maintain the meals? So Mr. Liebel decides to move them to the facility to maintain the meals, trying to honor this court's precedent and the rights of Kemp and Woodring. Now, I think because of this, because of the high generality with which they define clearly established law and the existing precedent already there, the court really does not have to reach the threshold question of whether there was a constitutional violation. I don't think Turner and O'Loan need to be applied here. But if they are, I do think that it's our position that the kosher kitchen plan, which involved the transfers, satisfied Turner and O'Loan. This was all about reducing costs of providing kosher food. Prior to the kitchen plan, the prepackaged kosher meals cost about four times that of regular meals. So there are cost considerations.  Mr. Falk introduced, for the first time on appeal, this contract from the public records. And we addressed that in our brief, but I was a little, I guess, in the dark when I wrote the brief. I thought that the prepackaged meals under that contract were still more than the meals to the kosher kitchens. I recently learned that that's not the case. So right now, all kosher meals, whether they're kosher kitchen or prepackaged, cost the same. But I don't think that alters the analysis for several reasons. First, the whole point of that contract is that the production for the lion's share of kosher meals are going to be done through the kosher kitchens. And in exchange, Aramark has bumped up its costs for all meals, kosher included, but it has agreed to eat the higher costs of the prepackaged kosher meals. But that's contingent on them having fewer prepackaged kosher meals. Second, the only evidence in the record is that Mr. Liebel was not aware of this aspect of the contract. Mr. Liebel does not oversee the contract. Under Mr. Liebel's view, it was providing the prepackaged kosher meals still was four times as expensive as the regular and kosher food production. And when we're talking about qualified immunity especially, we have to look at facts from the defendant's point of view. I think the last thing I want to address on the turnaround alone standard is that the plaintiffs say weighing in their favor is the fact that they did not have any alternative means of exercising group worship. And they cite a case from the Tenth Circuit, I think called Beerhide, that supports that. But that is directly contrary to what the Supreme Court held in Olón. In Olón, a group of offenders was prohibited from group worship. They were Muslim offenders. They were prohibited from engaging in Jumu'ah because of certain policies. And the Supreme Court found that alternatives did exist because they were still able to have a religious diet, they were able to have private worship, and they were able to have religious materials. I think the record bears out that although Kemp and Woodring were unable to have group worship at Wabash Valley Correctional Facility for the first nine months of their stay there, despite, again, the repeated efforts of Mr. Liebel and DOC staff, nothing prohibited them from private worship or from having their kosher diet or from having other materials. And if there are no further questions, Mr. Liebel would ask this court to affirm the district court's judgment. Thank you. Thank you, Mr. Craft. Mr. Falk, you have one minute. Thank you. Your Honor, I think in Olón the Supreme Court noted that the Muslim prisoners there were able to participate in other religious observances of their faith, and I think being denied absolutely the ability for congregate worship and study denied Mr. Kemp and Mr. Woodring the ability to engage in religious observances. And I would just say in conclusion that contrary to what is being argued, I do not think that Mr. Liebel faced an uncertain legal terrain. He was aware and should have been aware that under Turner, he could not deny the sincere religious exercise unless there was legitimate penological reason. There was absolutely no reason to move these two prisoners in April. The move could have waited. Other prisoners' moves had waited. Only 20 prisoners in all were moved in April. Not all of them were Jewish, so there was not an immediacy to the move. They could have waited until there were services and study available. He did not, and he is liable. Thank you. Thank you, Mr. Falk. Our thanks to both counsel, and the case will be taken under advisement.